## In Re Anonymous No. 70 D.B. 82

Disciplinary Docket Board No. 70 D.B. 82.

To The Honorable Chief Justice and Justices of The Supreme Court of Pennsylvania

KRAWITZ, Member, December 15, 1983 — Pursuant to Rule 208(d) (2) (iii), the Disciplinary Board submits the following recommendation.

### SUMMARY OF NATURE OF THE CASE

A petition for discipline was filed on November 3, 1982 which was submitted to hearing committee [     ], and hearings were held before the committee on February 23, 1983, March 31, 1983 and April 7, 1983.

Respondent was born in 1932 and was admitted to practice law in the Commonwealth of Pennsylvania on or about May 1, 1959. His former office address was at [     ]. His current address is [     ].

Respondent was charged with eight violations of the Code of Professional Responsibility, to wit:

Charge I — Willfully failing to properly represent two clients in a Personal Injury action thereafter causing the action to be dismissed for failure to

prosecute the failure to take Answers to Interrogatories. Willful failure to notify the clients of the suits' dismissal.

Charge II — Willful failure to properly represent the clients in a Personal Injury action causing the action to be dismissed for failure to prosecute. Willful failure to notify the client of such dismissal.

Charge III — Conversion and/or misappropriation of clients' settlement check by Respondent's agent. Thereafter, Respondent's failure to explain to clients the original conversion of funds by Respondent's agent.

Charge IV — Willful neglect and abandonment of legal practice; such neglect permitting Respondent's agent to illegally retain a client's portion of an insurance settlement.

Charge V — Willful failure to properly pursue a client's Personal Injury claim.

Charge VI — Willful failure to pursue client's claim and failure to notify client of dismissal of the claim.

Charge VII — Willful abandonment of client and client files upon respondent's eviction from [          ] legal address, and thereafter continued failure to notify clients that respondent was not attending to their files and legal matters.

Charge VIII — Willful employment of a suspended/disbarred attorney, thereafter allowing the aforementioned employee to hold himself out as respondent's associate or partner.

After hearing, the hearing committee determined that respondent had violated all of the charges as heretofore set forth. The hearing committee unanimously recommended that respondent be disbarred from the practice of law.

Respondent did not file an answer to the complaint, did not respond to notices and service made

upon him in relation to this matter, and did not attend the hearings and present any evidence whatsoever.

The hearing committee submitted a formal report which set forth a discussion of the evidence and its findings and conclusions, and the splendid report of the committee is such that we are embodying it and adopting the said report as quoted.

Accordingly, the report of the hearing committee is quoted as follows:

"The Respondent was charged in the first instance with willfully failing to properly represent two clients in a personal injury action, causing the action to be dismissed for failure to prosecute and failure to file Answers to Interrogatories. The Respondent willfully failed to notify the clients of the dismissal of the suit.

The second charge concerned another personal injury suit where the action was dismissed based on Respondent's failure to prosecute. Respondent never notified the client of such dismissal.

The third case concerned the actions of respondent's agent who illegally retained a client's settlement check. Thereafter, respondent issued a check to the client representing only a portion of the settlement, without explanation of the original conversion of the funds by Respondent's agent.

The fourth charge involved a personal injury action filed by respondent; where as a result of Respondent's neglect and abandonment of his practice, respondent's agent illegally retained the client's portion of insurance settlement.

The fifth charge, concerned Respondent's failure in a personal injury and property damage action to properly pursue the client's claim, resulting in prejudice to the client.

The sixth charge concerned the court's dismissal of a personal injury action, based on respondent's failure to pursue the claim. Respondent did not notify the clients of his failure to pursue the action or dismissal of the claim.

The seventh charge involved two issues: Respondent's failure to comply with the terms of his lease at his [      ] address, resulting in his eviction, and the discovery by new tenants that Respondent had abandoned his files and failed to notify clients that he was not attending to their files or legal matters.

The eighth charge concerned Respondent's willful employment of an attorney who Respondent knew was not entitled to practice law. Respondent further allowed the employee to hold himself out as Respondent's Associate or Partner.

The evidence offered regarding Charge I by Disciplinary Counsel demonstrated that on or about September 9, 1970, respondent told clients, [A], now deceased (decedent) and [B] that he had brought suit on their behalf against a responsible party in a motor vehicle accident. Thereafter clients heard nothing about the status of the case until 1976 when [B] received a phone call from a [C], an employee in respondent's office. [C] informed [B] that the case had been dismissed. [A's] son and [B] contacted the Lawyer's Reference Service to determine the status of the case. The Lawyer's Reference Service directed [A] and [B] to speak to respondent and to request a docket number to insure that the case had been filed. Respondent assured [A] and [B] that the delay was caused by court backlog, and failed to disclose that the case had been dismissed on or about April 19, 1972, for failure of the plaintiff to prosecute an action. Respondent never informed his clients that he would not pursue their claims.

Based on Respondent's failure to contact them, in April, 1980, [A] and [B] contacted a new attorney who filed a malpractice suit against respondent. Respondent has not yet answered the Notice to Appear to produce documents or to be deposed. Respondent has done nothing to make [A] or [B] whole.

The evidence supports the conclusion that respondent willfully neglected and failed to carry out legal matters entrusted to him, damaging the client permanently during the course of the professional relationship.

The evidence offered regarding Charge II by the Disciplinary Counsel indicated that the client, [D], retained respondent to prosecute a claim for personal injuries sustained in an automobile accident. The suit was filed on September 25, 1972 and dismissed June 23, 1976 based on respondent's failure to prosecute. Respondent never notified [D] or his father, as guardian, of the dismissal or the fact that he had not been pursuing or would not purse the claim.

In fact, the only communication from respondent's office to [D] came from [E] informing [D] that respondent's office was still working on [D's] case. At the time of the communication, [E] was suspended from the practice of law. He is now disbarred.

As a result of respondent's failure to pursue the claim in a timely fashion, [D's] cause of action is barred by the statute of limitations. The evidence again clearly supports the conclusion that respondent willfully neglected and failed to carry out legal matters entrusted to him, damaging the client permanently during the course of the professional relationship.

The evidence offered in support of Charge III demonstrated that respondent's employee and/or

agent, [E], illegally withheld client's ([F]) settlement check issued by the defendant insurance company in connection with litigation regarding personal injuries suffered by [F]. The check, in the amount of $6,500.00 was issued to [F] and [E], dated May 5, 1980. No money was distributed to [F] at that time. New counsel employed by [F] received a check from Respondent on or about December 3, 1980, in the amount of $1,476.46. The check was drawn on an account entitled "[     ] Corporation". Respondent never explained to [F] or her new counsel the reason for the seven month delay in distribution or why the settlement check was issued on a Florida bank. The evidence supports the conclusion that respondent willfully neglected and failed to carry out legal matters entrusted to him, that he failed to employ an attorney who would fairly represent his clients and that he failed to meet his ethical duty to report the conversion of [F's] check to [F] and to the proper authorities.

Support of the evidence offered by the Disciplinary Counsel in Charge IV demonstrated that, in another personal injury action, respondent, after filing suit on behalf of client, [G], on or about June 26, 1975, neglected and abandoned his responsibility to [G].

Responded permitted his associate, [E], to retain the entire settlement check in this matter, in the amount of $4,500, issued to respondent's office on or about March 18, 1981. [G] did not receive his share of the proceeds to which he was entitled, and respondent failed to explain to [G] why he did not distribute the proceeds to him.

The evidence also indicated that the settlement check has been deposited to Account No. [     ], at [     ] National Bank, titled "[E], Attorney Account". The deposited draft bore an endorsement

which was allegedly that of [G] but was not. Following the deposit into [E's] account, that portion of the settlement proceeds due and payable to [G] was embezzled, converted or misappropriated by [E]. Said conversion occurred while [E] held himself out to be an associate of the respondent, notwithstanding the fact that he had been disbarred.

The evidence taken as a whole supports the conclusion that respondent permitted such acts to occur through his neglect of his practice and abdication of his professional responsibilities to his practice.

The evidence offered by the Disciplinary Counsel in support of Charge V is similar to respondent's negligent actions in charges I and II. The evidence indicated that the client, [H], retained respondent in a personal injury action, following an automobile accident on or about December 5, 1975. Respondent agreed to represent [H] on a contingent fee basis of 40 percent. On or about December 9, 1976, [H's] insurance company reimbursed him for his medical bills and lost wages, in the amount of $2,616.99. Respondent retained 40 percent of this amount as his fee. On or about December 1, 1977, respondent's employee, [I], Esq., filed suit on [H's] behalf. Thereafter, neither respondent or respondent's employee took any further action to pursue [H's] claim; nor did they inform [H] that they were not pursuing his claim.

As a result of respondent's failure to pursue [H's] claim, the claim had been jeopardized and the client has been prejudiced, as it is likely that the claim would be dismissed if an attorney attempted to pursue it at this time.

The evidence offered in support of Charge VI by Disciplinary Counsel demonstrated that respondent's neglect of his practice caused the negligence

action of his client, [J] to be dismissed due to inactivity for an unreasonable period of time.

Respondent's former employee, [K], Esq., filed a suit on behalf of [J] on or about December, 1971. Thereafter, respondent did nothing to pursue [J's] case. Respondent never told [J] that the case had been dismissed or that he was not going to pursue [J's] claim. Respondent never responded to any of [J's] inquiries by phone or letter, including a certified letter to respondent's [    ] address, wherein [J] requested his file. Respondent never replied to request for release of [J's] file by new counsel retained by [J].

[J's] new counsel, [L] testified at the hearing that her office unsuccessfully attempt to reinstate the summons in trespass filed by respondent's office. The judge indicated that the only cause of action available to [J] was litigation against respondent. The new counsel indicated that even if the case had been successfully opened, the suit had initially been brought against the wrong party. Inasmuch as the statute of limitations had expired, the complaint could not be amended.

The evidence supports the conclusion that respondent willfully neglected and failed to carry out legal matters entrusted to him, damaging the client permanently during the course of his professional relationship.

The evidence offered in support of Charge VI focused on Respondent's abandonment of his clients and client files in general. The abondonment began with respondent's failure to comply with the terms of a lease for office space at [    ], respondent's ultimate failure to pay rent resulted in respondent's eviction from said premises.

The evidence showed that respondent had signed a lease with [M] for a five term on July 1, 1980 to June 30, 1985.

At the hearing on April 7, 1983, it was stipulated through affidavit that respondent was in arrears and that the lease was terminated on or about February 26, 1982.

Another affidavit indicated that [M] legaly regained possession of the premises following the filing of a Landlord/Tenant Complaint in Municipal Court. Respondent made no attempt to defend the Landlord/Tenant action or to provide for removal or storage of files located at [      ].

An additional affidavit demonstrated that the new tenant, [N], Esq., who moved into respondent's former suite, found respondent's office furniture, filing cabinets containing several hundred files, and recent and current correspondence, all addressed to respondent.

[N] sent inquiries to respondent via certified mail as to the handling of the files and office furniture. When respondent finally replied to [N's] inquiries, the files had already been transferred to storage.

The evidence under Charge VII taken as a whole, supports the conclusion that respondent willfully abandoned his clients and client files and failed or neglected to notify his clients that he was attending to the files, cases and legal matters, with prejudice or damage to the clients.

The evidence offered in support of Charge VIII focused completely on respondent's employee, [E], and respondent's willingness to allow [E] to hold himself out as respondent's associate or partner, and as an individual entitled to practice law.

On or about September 22, 1980, the Supreme Court of Pennsylvania suspended [E] from the practice of law and directed him to show cause why he

should not be disbarred. On or about March 13, 1981, the Supreme Court of Pennsylvania disbarred [E]. Although respondent knew that [E] was not entitled to practice law after November 21, 1980, respondent permitted [E's] name to remain on the law firm's letterhead, and allowed [E] to use respondent's office at [     ] and deal directly with respondent's files and clients while holding himself out to be a licensed practitioner.

The evidence taken as a whole supports the conclusion that respondent failed to maintain the integrity of the legal professional and failed to prevent the unauthorized practice of law."

The findings of fact of the hearing committee were as follows:

"1. Respondent is an attorney admitted to the practice of law in the Commonwealth of Pennsylvania. (N.T. 7, Feb. 23, 1983).

2. As a result of a motor vehicle accident, on September 9, 1968, [A], now deceased ("decedent"), and [B] ("[B]") retained Respondent to prosecute their claims for money damages for personal injuries arising out of the aforesaid accident. (N.T. 9, Feb. 23, 1983).

3. Prior to or about September 9, 1970, Respondent told decedent and [B] that he had brought suit on their behalf against the responsible parties in the above-mentioned accident. (N.T. 24, Feb. 23, 1983).

4. Between in or about 1970 and in or about 1975, Respondent had various communications with decedent and [B] with reference to their claims arising out of the aforesaid accident of September 9, 1968. (N.T. 24, Feb. 23, 1983).

5. In or around 1976, Respondent's employee, [C], informed [B] that the aforementioned case had been dropped. (N.T. 10, Feb. 23, 1983).

6. In response to [C's] phone call, decedent's son, [O], and [B] requested aid from the Lawyers Reference Service of the [      ] Bar Association, (N.T. 11, Feb. 23, 1983).

7. In or about 1976, following the Lawyer Reference Service advise, [O], and [B] asked Respondent for the docket number of their case which Respondent claimed that he had filed as aforesaid. (N.T. 11, Feb. 23, 1983).

8. Respondent told [O], and [B] that they need not worry about the case, without disclosing that the case had been dismissed. (N.T. 12, Feb. 23, 1983).

9. Respondent stated that [C] was an employee who had been fired recently and had been bad mouthing Respondent. (N.T. 12, Feb. 23, 1983).

10. Respondent stated there was no problem with the case and that the Courts were backlogged. (N.T. 12, Feb. 23, 1983).

11. Respondent provided [O], and [B] with a docket number which they took back to the Lawyer Reference Center. (N.T. 12, Feb. 23, 1983).

12. After the aforesaid conversation which occurred in or about 1976 both [O] and [B] made telephone calls to Respondent's office in an attempt to obtain a status report for the case. Although they left their names and telephone numbers and the request for a return telephone call, Respondent never returned these calls. (N.T. 14, Feb. 23, 1983).

13. In or about April, 1980, after getting no response from Respondent [O], and [B] retained new counsel, [      ] in [      ]. (N.T. 19, Feb. 23, 1983).

14. By letter dated May 12, 1980, sent by certified mail, return receipt requested, and received in Respondent's office on May 14, 1980, [B] and decedent's son, [O], demanded a written status report

with regard to their case from Respondent, which status report was to include the docket number of the law suit allegedly filed on behalf of decedent and [B]. (N.T. 20-21, 29, Feb. 23, 1983), Pet. Exh. — 2, 3).

15. Respondent did not reply to either the aforesaid letters from [O] or [B], although said letters were received in Respondent's office and he knew or should have known of the existence of the letters and the demands made therein. (N.T. 21, Feb. 23, 1983).

16. Respondent had filed suit on behalf of decedent and [B] on or about September 1, 1970, to August Term, 1970, No. [      ] in the Court of Common Pleas of [      ] County. (SIC)

17. Respondent never informed [B] or decedent of the aforesaid dismissal of their claim. (N.T. 15, 24, Feb. 23, 1983).

18. Respondent never told either decedent, [O] or [B] that he would not pursue the aforesaid claims or was not pursuing them. (N.T. 16, Feb. 23, 1983).

19. By virtue of the aforesaid dismissal, decedent or his estate, and [B] have been prejudiced because their right of action against Defendants, [      ], [      ] or other responsible parties has been terminated by virtue of the expiration of the statute of limitations. Respondent never took any action to reimburse decedent or his estate or [B] for the aforesaid failure to prosecute and the subsequent dismissal of their claims. (N.T. 36, Feb. 23, 1983).


## CHARGE II

20. Finding of Fact 1 is incorporated herein by reference.

21. On or about October 31, 1970, one [D] ("[D]"), of [      ], Pennsylvania, sustained per-

sonal injuries when the vehicle which he was driving was hit by a vehicle being operated by one [P]. (N.T. 9, March 31, 1983).

22. In the time period between on or about October 31, 1970, and December 9, 1970, [D] retained the Respondent to pursue a claim for damages for the personal injuries which [D] had sustained as aforesaid. (N.T. 10, March 31, 1983).

23. By letter dated December 9, 1970, Respondent confirmed to [D] that he represented [D] in the claims arising out of the aforesaid accident. (N.T. 11, March 31, 1983).

24. On or about September 26, 1972, Respondent commenced suit on [D's] behalf, September Term, 1972, No. [      ], in the Court of Common Pleas of [      ] County, by filing a Praecipe for Issurance of a Writ of Summons in Trespass. Respondent did not inform [D] of this action. (N.T. 22, March 31, 1983, Pet. Exh. 9, 15).

25. Thereafter, Respondent took no action with regard to [D's] case. (N.T. 12, 13, March 31, 1983).

26. On or about June 23, 1976, [D's] case, at the docket number aforesaid was dismissed by the Court of Common Pleas of [      ] County, for failure to prosecute. (N.T. 22, March 31, 1983, Pet. Exh. 9).

27. Respondent never notified either [D] or [D's] father (who had been suing as his parent and guardian because [D] was, at the time of commencement of the suit, a minor) of the fact that the case had been dismissed. (N.T. 13, March 31, 1983).

28. Respondent never informed either [D] or his father that he had not been pursuing or would not pursue the claim so that they could obtain other counsel to pursue the matter. (N.T. 21, March 31, 1983).

29. By virtue of the aforesaid dismissal, [D] has been prejudiced because his right of action against [P] or other responsible parties, has been terminated by virtue of the expiration of the statute of limitations for his claim.

30. By letters to Respondent dated August 19, 1980, November 23, 1980, December 9, 1980, and February 22, 1981, [D] sought status reports from Respondent regarding the aforesaid personal injury case. (N.T. 14-20, March 31, 1983, Pet. Exh. 10 — 13).

31. The only communication [D] received from Respondent's office occurred on or about December 15, 1980, when [E] ("[E]"), then suspended from practice and now disbarred, telephoned [D] to inform him that Respondent's office was still working on [D's] case. (N.T. 20, 21, March 31, 1983, Ex. P. 14).

32. Respondent never informed [D] that [E] was suspended from the practice of law.

## CHARGE III

33. Finding of Fact 1 is incorporated herein by reference.

34. In or about August, 1977, and at times previous thereto Respondent represented [F] and [Q], her husband, in the case of [F] v. [      ], in the Court of Common Pleas of [      ] County, No. [      ]. (N.T. 24, March 31, 1983).

35. In or about June, 1976, [F] retained [R], Esquire ("[R]") to represent her concerning an auto accident in which she and her former husband were involved. [F] was concerned that her former attorney (Respondent) had been proceeded with the complaint. Thereafter [R] filed an amended complaint. (N.T. 23, 24, 25, March 31, 1983).

36. In or about May, 1980, the Respondent or his employee, [E], settled the aforesaid case [F] v. [        ] for the sum of $6,500. (N.T. 25, 31, March 31, 1983).

37. Defendant insurance company, [        ], issued its draft No. 627015, dated May 5, 1980, drawn to the order of [Q] and [F] and [E]. (N.T. 66, March 31, 1983, Pet. Exh. 16).

38. The aforesaid insurance company draft was endorsed by all payees or their authorized agent(s) and negotiated through [        ] National Bank, [        ]. (Pet. Exh. 16).

39. The draft was deposited to the account of [E], who, thereafter, converted the proceeds of said draft to his own use. (N.T. 33, March 31, 1983, Pet. Exh. 17 — 19).

40. By letter dated December 3, 1980, Respondent distributed his check in the amount of $1,476.46 to [R], representing the portion of the settlement proceeds due to [F]. (N.T. 26, March 31, 1983).

41. The check issued by Respondent under cover of the aforesaid letter dated December 3, 1980, was dated December 28, 1980, and was drawn on an account entitled "[CC] Corporation" Account No. 902124082, at [        ] National Bank, [        ]. (N.T. 26, March 31, 1983).

42. Respondent never explained to [R] or [F] the reason for the delay in distribution of [F's] funds although he was aware of the reason. (N.T. 29, March 31, 1983).

43. After learning of the conversion of funds by [E] as set forth more fully above, Respondent had an ethical duty to report the fact of said conversion to Petitioner.

44. Notwithstanding the aforesaid duty on the part of the Respondent to report [E's] unethical con-

duct Respondent never reported the aforesaid conversion to Petitioner.

## CHARGE IV

45. Finding of Fact 1 is incorporated herein.

46. On or about July 2, 1973, one [G] ("[G]") sustained personal injuries when he was involved in a motor vehicle accident in the City of [      ]. (N.T. 39, March 31, 1983).

47. Within a short period of time after the occurrence of the aforesaid accident, [G] retained Respondent to prosecute an action on his behalf for money damages for the injuries which [G] had sustained. (N.T. 40, March 31, 1983).

48. On or about June 26, 1975, Respondent filed suit on [G's] behalf in [G] v. [      ], et al., June Term, 1975, No. [      ], in the Court of Common Pleas of [      ] County.

49. By letter dated April 10, 1981, Respondent informed [G] that his case had been settled for the sum of $4,500 and tendered to [G] a release reflecting said settlement. Said letter further requested that [G] sign the release before a witness and return that release to Respondent. (N.T. 42, March 31, 1983, Pet. Exh. 23).

50. In compliance with Respondent's request [G] signed the aforesaid release and returned it to Respondent. (N.T. 43, March 31, 1983, Pet. Exh. 26c).

51. On or about March 18, 1981, the [      ] Insurance Company issued its draft number 23959105 in the amount of $4,500 payable to the order of [G] and [E], Esquire ("[E]"). (N.T. 50, March 31, 1983, Pet. Exh. 26a).

52. Thereafter, [G] did not receive that share of the proceeds of the aforesaid $4,500 settlement to which he was entitled after deduction of Respon-

dent's fee and reimbursement of costs expended by Respondent. (N.T. 45, March 31, 1983).

53. Respondent never has explained to [G] why he was not paid his distributive share of the proceeds of the aforesaid settlement. (N.T. 45, March 31, 1983).

54. After [G] signed the aforesaid release and returned it to Respondent, [G] attempted on a number of occasions to contact Respondent by telephone at his listed office telephone number. Respondent's telephone was answered by persons other than Respondent and [G] left his name, telephone number and request for a return call. No one ever returned those telephone calls. (N.T. 43, 44, March 31, 1983).

55. By letter dated October 30, 1982, [G] wrote to Respondent and demanded that Respondent forward [G's] share of the settlement proceeds to him not later than November 15, 1981. (Pet. Exh. 24, 24a).

56. Respondent never replied to [G's] letter dated November 13, 1981.

57. On or about March 19, 1981, the aforesaid insurance company draft was deposited to account No. 514-223-7 at [      ] National Bank, titled "[E], Attorney Account". (Pet. Exh. 26a).

58. The aforesaid deposit of draft bore an endorsement purporting to be that of [G]. (Pet. Exh. 26a).

59. The aforesaid endorsement purporting to be that of [G] was placed on the draft in question by Respondent, or other employees of Respondent's without the knowledge or authorization of [G].

60. After deposit of the aforesaid [      ] Insurance Company draft into the [E] account, that portion of the settlement proceeds due and payable to [G] was embezzled, converted, misappropriated,

and otherwise misused by [E], who expended [G's] portion of the proceeds to his own uses and purposes and not for any use or purpose of [G].

61. The foregoing conversion and embezzlement occurred while [E] was disbarred. (Ex. P. 53).

62. Respondent's neglect and abandonment of his practice and abdication of his responsibilities to [E] permitted a conversion of [G's] funds by [E].

## CHARGE V

63. Finding of Fact 1 is incorporated herein.

64. On or about December 5, 1975, one [H], a resident of [     ] ("[H]"), was involved in an automobile accident in [     ]. As a result [H] sustained both personal injuries and property damage. (N.T. 57, March 31, 1983).

65. [H] retained Respondent to bring an action on his behalf to recover money damages against the other driver involved in the accident for the bodily injuries and property damage. (N.T. 57, 58, March 31, 1983).

66. Respondent agreed to represent [H] and enter into a contingent fee agreement with him whereby Respondent was to receive 40% of any amount of money which he recovered on [H's] behalf. (N.T. 57, 58, March 31, 1983), Pet. Exh. 27).

67. On or about December 9, 1976, [S] Insurance Company ("[S]") issued its draft number A3973958, drawn to the order of [H] and Respondent, in the amount of $2,616.99, as reimbursement for [H's] medical bills and lost wages under the PIP provisions of [H's] insurance policy with [S]. (N.T. 60, 72, March 31, 1983, Pet. Exh. 28a).

68. Notwithstanding the fact that the check represented reimbursement of lost wages and medical bills, respondent retained 40% of the aforesaid

funds as his fee and distributed the balance to [H] and to those persons entitled to payments from the balance. (N.T. 60, March 31, 1983).

69. On or about December 1, 1977, Respondent's employee, [I], Esquire, filed suit on [H's] behalf by Praecipe for Writ of Summons in Trespass in [H] v. [        ], November Term, 1977, No. [        ]. (Pet. Exh. 30a through 30e).

70. Thereafter, neither Respondent nor any employee of Respondent caused the issued summons to be served on the defendant or otherwise took further action to pursue [H's] claim.

71. Neither Respondent nor any employee of his informed [H] that they were not pursuing his claim against defendant [        ]. (N.T. 65, March 31, 1983).

72. In fact, [S's] file has been closed since in or about December, 1976, when the employee issued the aforesaid draft under the PIP provisions of [H's] policy. (Pet. Exh. 38a through 38e).

73. On various occasions since in or about 1977, [H] has demanded that Respondent return his file, but Respondent never has complied with these demands or communicated with [H]. (N.T. 64, March 31, 1983).

74. Respondent never offered explanation for his inaction in [H's] case or his failure to communicate with [H].

75. As a result of Respondent's failure to pursue [H's] claim against Defendant [        ], that claim has been jeopardized to [H's] prejudice.

## CHARGE VI

76. Finding of Fact 1 is incorporated herein.

77. On or about December 31, 1969, [J] and his wife, [T], and [U], and his wife, [V], riding in the same vehicle, sustained personal injuries when the

vehicle in which they were riding was struck by another vehicle, in [      ] County, Pennsylvania. (N.T. 76, March 31, 1983).

78. Within a short period of time following the aforesaid automobile accident, [J] retained Respondent to bring an action on his behalf to recover money damages for the personal injuries which he sustained in the aforesaid accident. (N.T. 77, 78, March 31, 1983).

79. On or about December 2, 1971, Respondent's employee, [K], Esquire, filed suit on behalf of the [J's] and [U's] by Praecipe for Writ of Summons in Trespass. (Pet. Exh. 34).

80. Suit as aforesaid was filed in [J], et al v. [W], Term of 1971, No. [      ], in the Court of Common Pleas of [      ] County. (Pet. Exh. 38).

81. After filing suit as aforesaid Respondent did nothing to pursue [J's] case except to have a succession of employees enter and withdraw appearances, finally entering his own appearance in the case in December, 1979. (N.T. 87, March 31, 1983, Pet. Exh. 38a, 38c, 38d).

82. In or about late 1979 or early 1980 the [      ] County Court of Common Pleas dismissed [J's] case pursuant to the policy enunciated at Pennsylvania R.J.A. No. 1901, which requires the Courts of Common Pleas to dismiss cases which have been inactive for unreasonable periods of time. (Pet. Exh. 38).

83. Respondent never told [J] that his claim against defendant [W] had been dismissed and Respondent never told [J] that he was not pursuing his claim against [W]. (N.T. 80, March 31, 1983).

84. At no time since the date he was retained by [J] did Respondent provide [J] with any status progress, or any report regarding his personal injury claim. (N.T. 81, March 31, 1983).

85. [J] attempted to reach Respondent by telephone calls and letters to Respondent's office to determine the current status of his case, but Respondent never responded to any of the inquiries made by [J]. (N.T. 79, March 31, 1983).

86. [J] sent certified mail letters to Respondent's last office address and to Respondent's current [      ] address, informing Respondent that Respondent was dismissed as an attorney and that he was to return [J's] files to him. Respondent has never replied to said letters and has never returned any files to [J]. (N.T. 80, 81, March 31, 1983, Pet. Exh. 31).

87. [J] recently retained new counsel, [      ], who also wrote to Respondent at Respondent's [      ] address and his [      ] office address and also requested the release of [J] files. However, Respondent has not replied to the letters from [J's] new counsel. (Pet. Exh. 33).

88. [J's] new counsel petitioned the Court to reinstate [J's] Summons in Trespass. (Pet. Exh. 35).

89. On or about November 24, 1982, the Court of Common Pleas of [      ] County, dismissed the Petition to Reinstate [J's] Summons in Trespass. (Pet. Exh. 37).

90. [J's] new counsel also discovered that Respondent and/or his employees had filed suit against the wrong party ([W]). In fact, [W's] son was driving the car at the time of the accident and the summons in trespass had not alleged agency. (N.T. 6, 7, April 7, 1983, Pet. Exh. 36).

91. Respondent's neglect of [J's] claim, prejudiced not only [J], but three co-plaintiffs, [J's] wife, [T], and [U] and [V]. (Pet. Exh. 38).

## CHARGE VII

92. Finding of Fact 1 is incorporated herein by reference.

93. On or about June 10, 1980, Respondent executed a five (5) year lease (July 1, 1980 through June 30, 1985) with [M], to rent and occupy quarters on the [      ]. (N.T. 9, April 7, 1983, Pet. Exh. 40a).

94. In or about Spring, 1981 [M] encountered a problem with unpaid and overdue rent under Respondent's lease. (Pet. Exh. 39).

95. Thereafter in June, 1981, Respondent brought his rent current but the problem of unpaid and overdue rent under Respondent's lease reoccurred in the Fall of 1981 and attorneys for [M], [      ] ("[      ]") became involved in attempting to collect the overdue funds. (Pet. Exh. 39).

96. The aforesaid problem of overdue and unpaid rents still was not corrected by Respondent and by letter dated February 26, 1982, [M] gave him notice of termination of the aforesaid lease. (Pet. Exh. 42a).

97. Respondent never replied to [M] and never brought payments up to date. (Pet. Exh. 42a).

98. As a result of a landlord/tenant action filed in Municipal Court, to collect rent arrearages and obtain possession of the premises, [M] obtained a Writ of Possession and Respondent was evicted from [      ]. (N.T. 12, April 7, 1983, Pet. Exh. 39, 58, 43, 101).

99. Respondent was put on notice of [M's] attempt to file a Municipal Court Landlord and Tenant Complaint for rent arrearages and possession by letter dated February 5, 1982, addressed to Respondent at his [      ] address. (Pet. Exh. 43).

100. Respondent did not defend the aforesaid Landlord and Tenant action and, as of the date of his eviction from [      ], had made no provisions with [M] for the removal and/or storage of client files which then and there were located in his former office suite. The only explanation ever offered by Respondent was that he thought his employee, [E], was paying the rent and he claimed to have wired funds for him to do so. (Pet. Exh. 43).

101. [M] rented Respondent's former suite to [N], Esquire. (N.T. 13, Pet. Exh. 39, 49).

102. On or about March 10, 1982, the new tenants moved into Respondent's former suite and found file cabinets containing approximately 200 client files belonging to Respondent. The new tenants did not know and did not believe it to be proper to determine whether those files were opened or closed. (Pet. Exh. 49).

103. On or about March 10, 1982, [N], one of the new tenants at Respondent's former suite sent a letter to Respondent by certified mail, return receipt requested, addressed to Respondent's [      ] address, requesting that Respondent either take possession of his files or provide him with directions for the disposition of the handling of said files. (Ibid).

104. By March 17, 1982, [N] had received no response from Respondent to the aforesaid letter dated March 10, 1982. (Ibid).

105. By letter dated March 17, 1982, sent by certified mail, return receipt requested, [N] asked Respondent to take possession of his files located at [      ] or to provide him with directions for the disposition or handling of those files. (Ibid).

106. Following receipt of the aforesaid letter, Respondent contacted [N] and expressed surprise at his ouster from the suite and the apparent abandonment of the aforesaid files. (Ibid).

107. In or about late March, 1982, [N] had the files, furniture, and other materials removed from the office suite and placed in storage on the 12th Floor at [      ]. (Ibid).

108. In or about April or May, 1982, Respondent appeared and retrieved the files from storage at [   ]. (Ibid).

109. [N] does not know what Respondent did with the aforementioned files after Respondent retrieved them from storage. (Ibid).

110. In or about 1978 or 1979, [X] retained Respondent to represent her in an accident claim against a bankrupt estate of Food Fair and Pantry Pride. (N.T. 16, April 7, 1983).

111. Thereafter, Respondent did not contact [X] by mail or telephone. (N.T. 16, April 7, 1983).

112. [X] attempted to contact Respondent at his [      ] Building address and was informed that Respondent had moved to [      ]. (N.T. 17, April 7, 1983).

113. Respondent never informed [X] of the move from [      ] Building to [      ]. (N.T. 17, April 7, 1983).

114. [X] never received any money on her claim against Pantry Pride. (N.T. 18, April 7, 1983).

115. On or about July 17, 1981, Food Fair, Incorporated, had drawn a check for $437.01 payable to [X] in the care of the Respondent. (N.T. 18, April 7, 1983, Pet. Exh. 55).

116. The aforementioned check was endorsed with two signatures, [X] and [E]. (N.T. 19, April 7, 1983, Pet. Exh. 55).

117. On or about January 15, 1982, Food Fair, Incorporated, had drawn a check payable to [X] in the care of Respondent for $45.68. (N.T. 19, April 7, 1983, Pet. Exh. 55a).

118. The aforementioned check was endorsed with two signatures, [X] and [E]. (N.T. 21, April 7, 1983, Pet. Exh. 55a).

119. [X] never received or endorsed the two aforementioned checks dated July 17, 1981 and January 15, 1982.

120. By virtue of his actions as aforesaid, Respondent abandoned his clients and client files.

121. Respondent failed and neglected to notify or inform his client that he was not attending to their files, cases or legal matters.

122. Respondent abandoned [X] and failed and neglected to notify or inform her that he was not attending to her file or legal matters.

123. Respondent's abandonment of [X's] file allowed [E] to improperly convert the aforementioned July 17, 1981 and January 15, 1982 settlement checks.

## CHARGE VIII

124. Finding of Fact 1 is incorporated herein by reference.

125. On or about September 22, 1980 the Supreme Court of Pennsylvania entered an order suspending [E] ("[E]") from the practice of law and directing him to show cause why he should not be disbarred. (Pet. Exh. 52).

126. By Opinion and Order dated March 13, 1981 the Supreme Court of Pennsylvania disbarred [E]. (Pet. Exh. 53).

127. By virtue of the operation of Pennsylvania R.D.E. 217(c) the aforesaid Order of suspension was effective 30 days thereafter. (Pet. Exh. 52).

128. Although Respondent knew that [E] was not entitled to practice law after November 21, 1980, by virtue of the aforesaid order of the Su-

preme Court of Pennsylvania, Respondent at all times subsequent to this date and up until the closing of his office at [   ] permitted [E] to hold himself out as Respondent's associate or partner and as an individual entitled to practice law by (a) permitting [E's] name to remain on Respondent's law firm office letterhead stationery and therefore using said stationery; (b) permitting [E] after the date of his suspension to use Respondent's law office letterhead stationery bearing [E's] name; and (c) permitting [E] to remain in Respondent's office at [        ] and to deal with Respondent's files and Respondent's clients as though he were a lawyer. (Pet. Exh. 54d, 54e, 54f and 54g)."

The Hearing Committees' discussion is herein quoted as follows:

"The Hearing Committee was presented with eight (8) separate charges against the defendant. While each of the charges standing alone evidences a violation of the Code of Responsibility, there is also a common thread weaving itself throughout all of the charges. There can be no doubt that Respondent did willfully seek and agree to represent clients in personal injury actions. The evidence is also clear that upon instituting an action, Respondent either failed to file the particular case, to inform clients of the status of their claims, to make timely responses to required court procedure, and/or to properly supervise his employees. It must and did follow that such neglect and abandonment of client responsibilities resulted in court dismissal of client actions, conversion of funds belonging to clients and other occurrences that could have been avoided had Respondent fulfilled his legal responsibilities with integrity and competence.

In the first charge it is clear that Respondent accepted [A] and [B] as clients. The evidence shows

that Respondent gave the aforementioned clients no reason to believe he would not pursue their claim. Respondent as a member of the Pennsylvania Bar was well aware of the importance of timely response to recognized court procedures. Respondent did not file timely Complaints or Answers to Interrogatories and it followed that [A] and [B's] claim was dismissed. To compound the injustice, Respondent never informed [A] or [B] of the dismissal and, in fact, assured both men that the delay in settlement was due to court backlog. Such evidence inevitably leads to the conclusion that Respondent made these false statements to conceal his neglect of his legal duty and to avoid disclosing information which might result in a malpractice suite against him.

The second charge of the Petition for Discipline alleges the same violations of the Disciplinary Rules and the Code of Professional Responsibility.

Respondent represented [D] in a personal injury action. The evidence clearly indicates that after [D's] suit was filed in court, Respondent took no action, which resulted in the dismissal of the case for failure to prosecute. Again Respondent failed to notify [D] of the dismissal or that he would not pursue the case. The evidence clearly shows that the only communication [D] received from Respondent's office occurred on or about December 15, 1980, when Respondent's employee, [E], then suspended from practice and now disbarred, telephoned [D] to inform him that Respondent's office was still working on the case.

While the Hearing Committee is not called upon to determine whether or not Respondent knew what [E] told [D], it is fair to conclude that Respondent's neglect of [D's] claim coupled with the employment of a suspended attorney greatly increased the probability that such misrepresentation would occur.

The Hearing Committee concludes that the evidence is as clear and convincing in Charge II as in Charge I that Respondent violated D.R. 1-102(a)(6) prohibiting an attorney from engaging in conduct which adversely reflects on fitness to practice law; D.R. 6-101(a)(3) prohibiting an attorney from neglecting a legal matter entrusted to him; D.R. 7-101(a)(1) prohibiting an attorney from intentionally failing to seek the lawful objectives of a client through reasonably available means permitted by law and disciplinary rules; D.R. 7-101(a)(2), which prohibits an attorney from intentionally failing to carry out a contract of employment entered into with a client for professional services; and D.R. 7-101(a)(3), which prohibits an attorney from intentionally prejudicing or damaging a client during the course of the professional relationship.

The third charge involves the conduct of Respondent's employee [E] and alleges Respondent's failure to report [E's] conversion of client [F's] $6,500 settlement check. The evidence is clear that [E] deposited the entire check in his personal account and months later that Respondent issued a check to [F] for a lesser amount from an entirely different account located in [       ]. The evidence further indicates that Respondent never explained to [F]or [R], her new counsel, the reason for delay in distribution or why the check was issued on a [   ] bank and not through the [       ] National Bank where the original settlement proceeds were deposited.

The Hearing Committee finds that there is not clear and convincing evidence that Respondent knew of [E's] conversion of the $6,500 settlement check. However, the Committee finds that Respondent did have knowledge that [F] did not receive her settlement distribution from the client escrow account as evidenced by his act of writing the

later check in November, 1980 from a business account in [    ].

There can be no question that Respondent's conduct adversely reflects on his fitness to practice law D.R. 6-101(a)(3) but did not violate D.R. 1-103(a) requiring an attorney possessing unprivileged knowledge of D.R. 1-102 violation to report it to some authority empowered to investigate.

The evidence in the fourth charge again concerns a personal injury action filed by Respondent on behalf of [G]. The Petition alleges that Respondent engaged in conduct which adversely reflects on fitness to practice law D.R. 1-102(a)(6) and neglected a legal matter entrusted to him. D.R. 6-101(a)(3).

The evidence offered again leads inevitably to the conclusion that Respondent, in fact, violated the aforementioned Disciplinary Rules. While Respondent filed [G's] claim in or about May, 1973, he had only one contact with [G] between 1973 and 1978. In April, 1981 Respondent did send [G] a letter containing a release in the amount of $4,500 in full settlement of the claim. Although [G] signed and returned the release papers he thereafter never heard anything more on the case. Continuous phone calls and registered letters to Respondent yielded no information. [G] never received any portion of the $4,500 settlement. However the evidence clearly shows that Respondent's employee, [E], did receive and deposit the settlement claim of $4,500 into his own account. [E] took such actions at a time when he had been suspended and disbarred from the practice of law in the State of Pennsylvania. The evidence is clear and convincing that the theft of [G's] funds by [E] was permitted to occur because of Respondent's neglect and abandonment of his practice and an abdication of his responsibilities to that practice.

The evidence presented in support of Charge V clearly supports the Disciplinary Counsel's contention that Respondent's failure to pursue [H's] claim for personal injuries filed December 1, 1977 jeopardized [H] claim.

The course of conduct Respondent engaged in was designed to promote his own interest at the expense of his client, [H]. In fact one year prior to the filing of the claim Respondent retained 40 percent of a reimbursement for medical bills and lost wages that [H] had received from his own insurance company. Thereafter the evidence shows that neither Respondent nor any of his employees pursued [H's] claim or complied with [H's] demand to have his files returned to him.

Charge VI alleges similar violations of the Disciplinary Code. In this case Respondent was retained to represent four parties in a personal injury claim and after filing suit the evidence shows that respondent failed to pursue his client's case, with the exception of having a succession of employees enter and withdraw appearances.

The Hearing Committee concludes that Respondent (1) should have originally brought suit against a different and, therefore, the proper party; (2) should have pursued his clients' interests; (3) should not have continued to assure his client that the case would be settled soon when it had already been dismissed; and (4) immediately should have informed the client of the dismissal when it occurred.

The testimony presents clear and convincing evidence that Respondent neglected a legal matter entrusted to him, D.R. 6-101(a)(3). Further Respondent intentionally failed to seek the lawful objectives of the client through reasonably available means permitted by law and Disciplinary Rules, as required by D.R. 7-101(a)(1).

Respondent intentionally failed to carry out his contract with [J] for professional services in violation of D.R. 7-101(a)(2) and intentionally prejudiced [J] during the course of their professional relationship in violation of D.R. 7-101(a)(3).

Charge VII involved many of the same issues of the aforementioned charges but also incorporates allegations that Respondent willfully neglected and totally abandoned hundreds of clients and completely abdicated responsibility to his clients and the legal profession. The seventh charge alleges the same violations as the aforementioned charges with the addition of D.R. 2-110(a)(2).

Disciplinary Rule D.R. 2-110(a)(2) specifically prohibits an attorney from withdrawing from employment until he has taken reasonable steps to avoid foreseeable prejudice to the rights of the client, including giving due notice to the client, allowing time for the employment of other counsel, delivering to the client all papers and property to which his client is entitled, and complying with applicable laws and rules.

The Hearing Committee is convinced that Respondent blatantly violated D.R. 2-110(a)(2) by his actions involving his lease and subsequent eviction from [      ]. The evidence is clear that Respondent did not defend the aforesaid Landlord and Tenant action, and as of the date of his eviction from [      ] Respondent never made any provisions with [M] for removal of or storage of client files located in his office suite.

The Disciplinary Counsel's submission of an affidavit by one of the tenants who moved into the suite at [      ] formerly occupied by Respondent convinces the Hearing Committee that Respondent had indeed made no effort whatsoever to provide for his client's needs and was indifferent to abandoning the

clients and his obligation to attend to their legal problems. Testimony by Petitioner's witness, [X] provided evidence that the basic courtesy of a change of address was not even afforded to Respondent's clients. The aforementioned witness provided further evidence that Respondent's abandonment did indeed prejudice the clients. Her failure to receive two settlement checks and the disclosure that the same settlement checks were converted by Respondent's employee is clear and convincing evidence that Respondent violated the Disciplinary Rules.

We do not consider it necessary to elaborate extensively on whether Respondent knew of the illegal acts of his employee. The evidence does portray a member of the bar who abandoned his clients, and the accompanying legal responsibilities without concern for the clients or the outcome of their legal problems. At the least, Respondent's appropriate course of conduct would have involved notifying the various clients of Respondent's move to [      ]. At best, a member of the bar with integrity and respect for his clients would have attempted to secure new legal counsel. Respondent's decision to allow a suspended/disbarred attorney to "represent him" is clear evidence that Respondent violated the Rules of Code of Professional Responsibility.

Finally in Charge VIII, the focus shifts to Respondent's employee, [E], who has been directly referred to in the aforementioned charges. We are not called upon to analyze the record of [E]. Affidavits submitted to the Hearing Committee clearly document that [E] was first suspended November 21, 1980 and later disbarred from the practice of law, March 13, 1981, for serious acts of misconduct involving the co-mingling and conversion of client funds, misrepresentation and the neglect and intentional failure properly to represent his clients.

Respondent knew that [E] was not entitled to practice law after November 21, 1980 and yet he allowed [E] to hold himself out as Respondent's associate or partner to Respondent's clients as though he were indeed a lawyer.

Respondent's obvious willingness to allow the aforementioned to occur, is clear evidence that he violated D.R. 1-102(a)(6) which prohibits an attorney from engaging in other conduct which adversely reflects on fitness to practice law and D.R. 3-101(a) which prohibits an attorney from aiding a non-lawyer in the unauthorized practice of law."

The conclusion of law of the hearing committee are as follows:

"The Hearing Committee concludes that sufficient evidence of a clear and convincing nature demonstrates:

1. Repeated violations of D.R. 1-102(a)(6), in that Respondent with knowledge that clients' cases had been dismissed did fail to notify clients of same, or did make false statements as to the status of clients' claims, and did fail to continue to pursue clients' claims to clients' prejudice.

2. Violations of D.R. 2-110(a)(2) in that Respondent knowingly abandoned his office location at [      ] and relocated to [      ], leaving more than 200 client files, without giving due notice of his leaving to clients, without allowing time for employment of other counsel, and without delivering all papers and property to which the clients were entitled, and throughout allowing a disbarred lawyer to hold himself out as Respondent's associate or representative.

3. Violation D.R. 3-101(a), in that Respondent knowingly allowed a suspended/disbarred attorney to hold himself out as Respondent's associate or partner, permitted a suspended/disbarred attorney's

name to remain on Respondent's law firm letterhead stationery and knowingly allowed a suspended/disbarred attorney to remain in Respondent's office and deal with Respondent's files and Respondent's clients as though he was a lawyer.

4. Violation of D.R. 6-101(a)(3), in that Respondent, with knowledge that clients placed their trust in his abilities as an attorney, willfully and continually failed to meet timely court deadlines in filing of client complaints, answers, and interrogatories, such failure resulting in unnecessary dismissal of client claims.

5. Violation of D.R. 7-101(a)(1) by engaging in conduct in violation of D.R. 1-102(a)(6), D.R. 6-101(a)(3).

6. Violation of D.R. 7-101(a)(2) by engaging in conduct in violation of D.R. 1-102(a)(6), D.R. 6-101(a)(3) and D.R. 7-101(a)(1).

7. Violation of D.R. 7-101(a)(3) by engaging in conduct in violation of D.R. 1-102(a)(6), D.R. 6-101(a)(3) and D.R. 7-101(a)(1).

8. Violation of D.R. 9-102(b)(4) in that Respondent, with knowledge that client had secured new counsel, did ignore client's request to return files to client.

The Hearing Committee conducted hearings on February 23, 1983, March 31, 1983 and April 7, 1983 in accordance with R.D.B. §89.151 to consider evidence relevant to the type of discipline to recommend.

An affidavit averred that Respondent was personally served with a Petition for Discipline and a Subpoena for the hearing. Respondent was also served with a Subpoena Duces Tecum directing Respondent to produce records. Respondent was also notified of the hearing dates by certified mail. Neither Respondent nor counsel for Respondent appeared at any of the hearings.

At the direction of the Hearing Committee, Disciplinary Board counsel sent Respondent a letter, dated April 7, 1983, informing him that the hearing on the charges against him had been concluded. The letter further informed him of the Committee's willingness to permit him until April 21, 1983, to submit any material he wished to submit on his own behalf. Respondent did not reply. Thereafter, Disciplinary Board counsel requested the record be closed.

Disciplinary Board counsel submitted a prior disciplinary record to the Hearing Committee. The Hearing Committee has heard nothing further from Respondent concerning any of the eight charges in the Petition for Discipline. Accordingly, the Hearing Committee will use such information as may be found in the records at hand which are relevant, and the prior disciplinary record is admitted without objection.

It appears that Respondent is 51 years old, and is believed to be estranged or possibly divorced from his wife. She is believed to reside at the former marital domicile of the couple in [      ]. It is not known whether the Respondent has any children.

He is a graduate of [        ] University's School of Law and was admitted to the Bar in 1959. During the last ten years he is known to have maintained offices in the [        ] Building (now the [        ] Building), the [        ] Hotel, the [        ] Building and [        ], all located in [        ]. During that period of time he employed a variety of associates including, and in what is believed to be chronological order, [K], [Y], [I], [Z] and [E]. Except for [E], who is believed to have worked for Respondent for a period in excess of three years, all of the associates are believed to have worked for Respondent for two years

or less. It is believed that Respondent did not have any partners during the ten year period of time in question.

During the same ten year period, Respondent is known to have been the principal in the [AA] Cab Company from the beginning of the ten year period until approximately 1976; to have been a principal in a business known as the [BB] Group, the nature of which is not known; and to have been the principal in the [CC] Corporation, a construction and land development company located in [      ], since before 1958. It is believed that both [AA] Cab and the [CC] Corporation occupied all of Respondent's time and that his practice of law was minimal during that period of time. His income from his ventures is not known.

Unfortunately, Respondent is not a stranger to the disciplinary process. This Hearing Committee administered three prior informal admonitions for violating D.R. 1-102(a)(4), 6-101(a)(3) and 7-101(a)(1), (2) and (3).

On or about March 17, 1983, in United States District Court, Respondent entered a plea of guilty to two counts of failure to file income tax returns, a Federal misdemeanor. Sentencing was scheduled for April 27, 1983.

The eight violations this Hearing Committee has considered closely involve Respondent's relationship with his clients. They strike at the very heart of the practice of law because they show Respondent to be a person whose actions involve a breach of the public trust. A client must be able to look to his attorney for sound advice, know that the attorney will pursue his/her interest vigorously and effectively; and rest assured that any financial transactions car-

ried out on the client's behalf will be scrupulously honest, will be fully accounted for at the client's request, and will involve full and immediate payment of funds that are due and owing the client. A lawyer who engages in the kind of conduct involved in this proceeding does not manifest the traits of good moral character required in the furtherance of the administration of justice and expected of persons who are given the privilege and duty of representing clients and the responsibility of behaving as officers of the court. Such a person is hardly one in whom the judicial system can place its trust. Therefore such a person is not fit to represent others in the practice of law.

The Hearing Committee has given much thought to the extent of the discipline to recommend. It is our judgment that anything less than disbarment would be inappropriate. The past disciplinary history of this Respondent is not conducive to an attitude of leniency in recommending the type of discipline appropriate to the conduct in question.

The Respondent has received three prior informal admonitions. He is the defendant and has filed a plea of guilty in a case involving two counts of income tax evasion, a Federal misdemeanor. The record in this case shows that Respondent has breached the public trust in many instances with a number of different clients over a period of years.

Respondent no longer retains an office in the Commonwealth. His lack of response to the Disciplinary Board investigation indicates a total lack of interest in explaining or defending this series of charges. The Disciplinary Board finds clear violations of nine Disciplinary Rules. There is no reason to believe that Respondent's conduct will be different in the future. Neither is there a need to allow

even the remotest possibility that Respondent could breach the public trust again in the future."

Disciplinary Board's Recommendation to Supreme Court of Pennsylvania:

The Disciplinary Board of the Supreme Court of Pennsylvania unanimously accepts the recommendation of Hearing Committee [      ] that Respondent be disbarred from the practice of law in the Commonwealth of Pennsylvania, and unanimously recommends such disposition to the Supreme Court of Pennsylvania.* The board further recommends that costs are to be paid by respondent.

## ORDER

NIX, *C.J.*, And now, this January 20, 1984, the recommendation of the Disciplinary Board dated December 15, 1983, is accepted, and it is ordered that [Respondent] be and he is disbarred from the Bar of this Commonwealth, and he shall comply with all the provisions of Rule 217, Pa.R.D.E. It is further ordered that respondent shall pay costs to the Disciplinary Board pursuant to Rule 208(g), Pa.R.D.E.

---

* The hearing committee and the Disciplinary Board of the Supreme Court of Pennsylvania had no knowledge of and therefore did not consider in its deliberations an order of the Supreme Court of Pennsylvania dated June 21, 1983 suspending respondent from the practice of law, respondent having been convicted in the United States District Court for the Eastern District of Pennsylvania for failure to file Federal Income Tax Returns.